**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ANGELICA REBECA GONZALEZ-GARCIA, et al., <br><br> Plaintiffs, <br><br> v. <br><br> JEFFERSON BEAUREGARD SESSIONS III, et al., <br><br> Defendants. | Civil Action No._____ |

**MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION FOR TEMPORARY RESTRAINING ORDER AND**
**PRELIMINARY INJUNCTION**

**INTRODUCTION**

Plaintiff Angelica Gonzalez-Garcia is an asylum-seeker whose seven-year-old daughter was forcibly separated from her as a result of the ICE's recent detention practices at the border. She brings this action because the government is refusing to release her daughter, S.K., from detention shelter where the girl—now eight years old, after having spent her birthday in captivity— has suffered emotional distress and physical harm.  The government has offered no legitimate basis for this continued detention despite Ms. Gonzalez-Garcia's pleas for S.K.'s release and her uncontested fitness to care for her own child.  Now, after more than six weeks of forced separation, Ms. Gonzalez-Garcia asks this Court to require that S.K. be reunited with her at once.

As explained herein, because Ms. Gonzalez-Garcia and S.K. have a strong likelihood of success on the merits of their claims, and because the continuing and irreparable harm to both Plaintiffs can only be ended by their reunification, they respectfully request that this Court enter an injunction to prevent further harm to the child and her mother.

1

## BACKGROUND

Ms. Gonzalez-Garcia and her daughter, S.K. arrived in the United States and sought asylum on or about May 9, 2018. Affidavit of A. Gonzalez-Garcia ("Gonzalez-Garcia Aff.") ¶ 3. On May 11, 2018, they were forcibly separated, and have remained apart since that time. Gonzalez-Garcia Aff. ¶¶ 2, 13. Ms. Gonzalez-Garcia was subsequently transferred from Arizona to a facility in Colorado without her daughter. Gonzalez-Garcia Aff. ¶ 17. Although she diligently filed request slips seeking information about her daughter, to Ms. Gonzalez-Garcia's extreme distress, the government refused to provide Ms. Gonzalez-Garcia with any information about her daughter's location. Gonzalez-Garcia Aff. ¶¶ 16-17.

Nearly two weeks after they were first separated, Ms. Gonzalez-Garcia finally learned the location of her daughter, although not through any information provided by the government. Rather, thirteen days after Ms. Gonzalez-Garcia was separated from her daughter, Ms. Gonzalez-Garcia was able to call her home in Guatemala whereby she learned for the first time that her daughter was detained in a shelter in Harlingen, Texas at the direction of the Office of Refugee Resettlement ("ORR"). Gonzalez-Garcia Aff. ¶ 18. Ms. Gonzalez-Garcia was finally able to call her daughter several days later. *Id.* Although she was relieved to speak to her daughter, through an extremely limited number of phone calls, Ms. Gonzalez-Garcia learned that S.K. had been physically injured by another detained child, leaving her bruised and in pain, had contracted an infection that was reported to be conjunctivitis, had suffered a high fever, and was has been extremely fearful because of her inability to contact her mother. Gonzalez-Garcia Aff. ¶¶ 18-21.

On June 18, 2018, Ms. Gonzalez-Garcia appeared before an immigration judge in connection with her asylum application. Gonzalez-Garcia Aff. ¶ 23. She was released from the Colorado facility on bond the next day. *Id*. Unfortunately, this release did not lead to a reunion

with her daughter. Instead, Ms. Gonzalez-Garcia became distressed to learn that she would not be reunited with her daughter unless she passed the screening to become a "sponsor" for her own daughter – a process that could weeks if not months. Gonzalez-Garcia Aff. ¶¶ 23-28.

While the government is presently aware that Ms. Gonzalez-Garcia is S.K.'s mother, and is now domiciled in Framingham, Massachusetts awaiting her asylum hearing, it still refuses to release S.K.. Instead, it is Ms. Gonzalez-Garcia to additional screening requirements as if she were a stranger to her own child—requirements that are wholly inappropriate for the case of a parent whose child was forcibly and unlawfully seized without any legitimate basis. Affidavit of Susan B. Church, Esq., ("Church Aff.") ¶ 3.

## I. LEGAL STANDARD

In considering whether to grant a preliminary injunction, district courts in this Circuit look to: "(i) the movant's likelihood of success on the merits of its claims; (ii) whether and to what extent the movant will suffer irreparable harm if the injunction is withheld; (iii) the balance of hardships as between the parties; and (iv) the effect, if any, that an injunction (or the withholding of one) may have on the public interest." *Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 9 (1st Cir. 2013); *W. Holding Co., Inc. v. AIG Ins. Co.-Puerto Rico*, 748 F.3d 377, 383 (1st Cir. 2014) ("Whether a mandatory preliminary injunction should issue typically depends on the exigencies of the situation, taking into account [the] four familiar factors . . . .").

> The purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits. It often happens that this purpose is furthered by preservation of the status quo, but not always. If the currently existing status quo itself is causing one of the parties irreparable injury, it is necessary to alter the situation so as to prevent the injury, either by returning to the last uncontested status quo between the parties, *Ross-Whitney Corp. v. Smith Kline & French Laboratories*, 9 Cir. 1953, 207 F.2d 190, by the issuance of a mandatory injunction, see 7 Moore's Federal Practice P65.04(1), or by allowing the parties to take proposed action that the court finds will minimize the irreparable injury. The focus always must be on prevention of injury by a proper order, not merely on preservation of the status quo.

3

*Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974). Courts may grant mandatory preliminary injunctions where "the exigencies of the situation demand such relief." *Massachusetts Coal. of Citizens with Disabilities v. Civil Def. Agency & Office of Emergency Preparedness of Commonwealth of Massachusetts*, 649 F.2d 71, n. 7 (1st Cir. 1981) (denying motion for a mandatory preliminary injunction); Robert Haig, 3d *Bus. & Comm'l Litig. in Fed. Cts*. § 17:26 (2011) ("Nonetheless, the court may still grant a mandatory preliminary injunction when necessary to protect the movant from irreparable harm and to preserve the court's ability to render a meaningful decision.").

## II. ARGUMENT

### A. PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR CLAIMS

#### i. *Plaintiffs Are Likely To Succeed On Their Claims That S.K.'S Continued Detention Is Unconstitutional And Violates Due Process*

Plaintiffs' right to fairly and fully seek protection against unlawful detention of a minor is one the core of constitutional protections of Due Process. The Due Process clause guarantees fair procedures prior to deprivations of life, liberty, or property, including removal from the United States. *See Reno v. Flores*, 507 U.S. 292, 306 (1993) ("It is well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings."). The Supreme Court has long recognized family integrity to be one of the most fundamental liberty interests that the Constitution protects. *Suboh v. Dist. Attorney's Office of Suffolk Dist.*, 298 F.3d 81, 91 (1st Cir. 2002) ("To begin, '[t]he interest of parents in the care, custody, and control of their children is among the most venerable of the liberty interests embedded in the Constitution.'") (*quoting Hatch v. Dep't of Children, Youth & Their Families*, 274 F.3d 12, 20 (1st Cir. 2001)); *Lee v. City of Los Angeles*, 250 F.3d 668, 685 (9th Cir. 2001) ("It is well established that a parent has a fundamental liberty interest in the companionship and society of his or her child. . . .")

4

(quotation marks omitted); *J.B. v. Washington County*, 127 F.3d 919, 925 (10th Cir. 1997) ("[F]orced separation of parent from child, even for a short time, represents a serious infringement upon both the parents' and child's rights.") (quotation marks omitted); *Jordan v. Jackson*, 15 F.3d 333, 342 (4th Cir. 1994) ("The state's removal of a child from his parents indisputably constitutes an interference with a liberty interest" sufficient to trigger constitutional scrutiny.); *Duchesne v. Sugarman*, 566 F.2d 817, 825 (2d Cir. 1977) ("[T]he most essential and basic aspect of familial privacy [is] the right of the family to remain together without the coercive interference of the awesome power of the state.").

On June 26, 2018, another federal district court considering the constitutional claims of parents whose children were taken from them due to the family separation policies at the southern U.S. border ruled that such separation does give rise to a likelihood of success on the merits of due process claim for relief. *Ms. L. v. U.S. Immigration & Customs Enf't*, -- F. Supp. - (S.D. Cal. 2018), 18cv0428 [Dkt 83] ("Order on Motion for Preliminary Injunction" at 17) (June 26, 2018) ("[t]his practice of separating [migrant parents] from their minor children, and failing to reunify [them] with those children, without any showing the parent is unfit or presents a danger to the child is sufficient to find Plaintiffs have a likelihood of success on their due process claim.")).. The court required that parents who have been released from DHS custody be reunited with their children and granted 30 days from the issuance of its order for the government to reunite detained children over five years old with their parents.[1]

Ms. Gonzalez-Garcia, who has already been separated from her daughter for six weeks, seeks immediate relief from this Court because there is no further impediment to reunification

---

[1] In this case, where Ms. Gonzalez-Garcia has been released and her child's whereabouts are known, immediate release is appropriate.

that would legitimately require any additional time in custody for S.K. – Ms. Gonzalez-Garcia's information including fingerprints, have already been provided to the government, but instead of agreeing to release S.K., the government is continuing to impose arbitrary "sponsorship application" requirements notwithstanding the clear due process violation that such continued detention represents.

> ii.  *Plaintiffs Are Likely To Succeed On Their Claims That S.K.'s Continued Detention Is Unconstitutional And Violates Equal Protection*

The Due Process clause of the Fifth Amendment additionally prohibits the government from denying equal protection under the law. *See Splude v. Apfel*, 165 F.3d 85, 91 (1st Cir. 1999) ("The federal government is not directly governed by the equal protection clause, which appears only in the Fourteenth Amendment, but the Supreme Court has held that equal protection principles are implicit in the Fifth Amendment's due process clause."). Official actions that reflects a discriminatory intent and classifications based on race or national origin receive exacting scrutiny. *Massachusetts v. U.S. Dep't of Health & Human Servs.*, 682 F.3d 1, 8–9 (1st Cir. 2012) ("Certain suspect classifications—race, alienage and national origin—require what the Court calls strict scrutiny, which entails both a compelling governmental interest and narrow tailoring.").

Defendants' decisions to separate families from Central America arriving at the southern border seeking asylum, and to isolate children in detention facilities separate from their parents, are unconstitutional because they were motivated, at least in part, by intentional discrimination based on race, ethnicity, and/or national origin. This intentional discrimination includes bias against immigrants perceived to come Central American countries. As a result of these decisions, including the decisions that have caused their separation, Ms. Gonzalez-Garcia and S.K. have been and are being denied equal protection.

6

4823-3965-2972.1

### iii. Plaintiffs Are Likely To Succeed On Their Claims That The Defendants' Actions Violate the Administrative Procedure Act

The Administrative Procedure Act ("APA") provides an avenue to seek judicial review of "final" agency actions. 5 U.S.C. § 704. Under this review, an agency's actions are to be found invalid when they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "unsupported by substantial evidence. . . ." 5 U.S.C. §§ 706(2)(A), (E); *see also Citizens Awareness Network, Inc. v. U.S. Nuclear Regulatory Comm'n*, 59 F.3d 284, 290 (1st Cir. 1995) ("We review agency actions and decisions with substantial deference, setting them aside only if found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.") (internal quotations omitted). Although the standard of review is "highly deferential . . . , it is not a rubber stamp; in order to avoid being deemed arbitrary and capricious, an agency decision must be rational." *Citizens Awareness Network*, 59 F.3d. at 290. Additionally, "when an administrative agency departs significantly from its own precedent, 'it must confront the issue squarely and explain why the departure is reasonable.'" *Id.* (*quoting Dávila–Bardales v. INS*, 27 F.3d 1, 5 (1st Cir.1994)).

Here, Plaintiffs are likely to prevail on their APA challenge. First, as a preliminary matter, the Defendants' actions are final and ripe for review. The ORR's decision to continue to detain S.K., despite the fact that she has a mother able to care for her in the least restrictive setting, represents a final decision for purposes of the APA.

In June 2018, in the midst of public outcry involving the government's practices of separating parents from children, ORR made it more difficult to release "unaccompanied" children by creating a new requirement that each adult household member in the home of the "sponsor" be fingerprinted. Under the Rule, fingerprints are shared with DHS for immigration checks and criminal checks. ORR Policy Guide, *Children Entering the United States*

7

*Unaccompanied* § 2.5.1 (revised June 7, 2018), available at acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-2#2.5.1.

Although she was already fingerprinted at the border, and although her child was taken from her by the government, Ms. Gonzalez-Garcia has been informed that she may not be reunited with S.K. unless she complies with these procedures, which would require her to wait until July 16, 2018, for a fingerprint appointment in Newark, New Jersey. Because processing could take additional weeks after the application for "sponsorship" is completed, it is likely the earliest that ORR could reunite Ms. Gonzalez-Garcia with her eight-year-old daughter is August 2018. Ironically, having provided no process at all for considering S.K.'s best interests before tearing her from her mother and placing her in the care of strangers, the government now erects a mountain of paperwork and checks to ensure that she will not be harmed by reunification. Applying these burdensome requirements to children like S.K.—who seek reunification with a parent from whom they were forcibly separated—unreasonably extends family separations that never should have occurred to begin with. It is devoid of any legitimate child welfare rationale, and is arbitrary, capricious, an abuse of discretion, and contrary to law.

That conduct violates the government's most basic APA obligations. *Encinco Motorcars, LCC v. Navarro*, 136 S. Ct. 2117, 2127 (2016) (agency decision fails this standard when "the agency . . . gave almost no reasons at all"). In order to avoid being deemed arbitrary and capricious, an agency decision must be rational. *Adams v. EPA,* 38 F.3d 43, 49 (1st Cir. 1994).

### iv.  *Plaintiffs Are Likely To Succeed On Their Claims That The Defendants' Actions Violate The* **Flores** *Settlement Agreement*

The *Flores* Settlement (the "Settlement"), signed in 1997, sets forth a "nationwide policy for the detention, release, and treatment of minors in the custody of [immigration officials]," and requires these officials to treat "all minors in its custody with dignity, respect and special concern

for their particular vulnerability as minors." *See Flores* Settlement at ¶¶ 9-11. "The Settlement creates a presumption in favor of releasing minors and requires placement of those not released in licensed, non-secure facilities that meet certain standards." *Flores v. Lynch*, 828 F.3d 898, 901 (9th Cir. 2016). The Settlement continues to be binding upon the government. *See id.* at 905-06. The Settlement requires federal officials to "place each detained minor in the ***least restrictive setting*** appropriate to the minor's age and special needs, provided that such setting is consistent with its interests to ensure the minor's timely appearance before the [DHS] and the immigration courts and to protect the minor's well-being and that of others." *See Flores* Settlement at ¶ 11 (emphasis added).

The Settlement sets plainly favors releasing a minor to the custody of a parent or guardian. *See Flores* Settlement, Section VI, "GENERAL POLICY FAVORING RELEASE." Notably, Paragraph 14 requires that where immigration officials determine that a minor's detention "is not required either to secure his or her timely appearance before [DHS] or the immigration court, or to ensure the minor's safety or that of others," they shall release the minor "without unnecessary delay" to a parent, guardian, or other adult or licensed program willing to accept legal custody. *See Flores* Settlement at ¶ 14. Release to a parent is preferred. *Id.* A minor who is not released to a parent or other adult or program under Paragraph 14 shall remain in the custody of federal agencies and be "placed temporarily in a licensed program until such time as release can be effected in accordance with Paragraph 14 or until the minor's immigration proceedings are concluded, whichever occurs earlier." *Id.* ¶ 19.

Additionally, pursuant to Paragraph 24(B) of the Settlement, a minor may challenge a determination to place him or her in a particular facility when in government custody and may

seek judicial review in "any United States District Court with jurisdiction and venue over the matter to challenge the placement determination." *See Flores* Settlement at ¶ 24(B).

Here, Defendants' policies, practices, acts, and omissions with respect to S.K.'s continued detention plainly violate the Settlement. Despite the availability of a parent able to take immediate custody of S.K., the Defendants' continue to detain her. Continuing to detain S.K. is plainly not placing her in "the least restrictive setting" or releasing her "without unnecessary delay" to a parent willing to accept custody. *See Flores* Settlement ¶¶ 11, 14, 19.

### B. PLAINTIFFS ARE SUFFERING IRREPARABLE HARM ABSENT EMERGENCY RELIEF

There are few harms more severe than imposing a traumatic detention event on a child for no legitimate reason. Harm is irreparable only if no adequate legal remedy exists. *Foxboro Co. v. Arabian Am. Oil Co.*, 805 F.2d 34, 36 (1st Cir. 1986) ("We do not find irreparable injury where only money is at stake. . . ."); *see also Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 19 (1st Cir. 1996) (an injury is "irreparable" if it is "not accurately measurable or adequately compensable by money damages . . . ."). The harm that will be suffered by S.K. is the deprivation of her liberty in conditions in which she has health problems, isolation, and most of all, has been separated from her months for weeks on end, with more weeks of needless isolation anticipated without this court's intervention. As the Fourth Circuit recently explained, "[p]rolonged and indefinite separation of parents [and] children . . . create not only temporary feelings of anxiety but also lasting strains on the most basic human relationships . . . ." *Int'l Refugee Assistance Project v. Trump*, 883 F.3d 233, 270 (4th Cir. 2018).

Aside from the human challenge is the potential for lasting medical damage to S.K.. The American Academy of Pediatrics has denounced the recent practice of separating immigrant children from their parents, explaining that the "[s]eparation of a parent or primary caregiver

from his or her children should never occur, unless there are concerns for [the] safety of the child at the hand of [the] parent."[2] If this Court does not grant preliminary injunctive relief, Ms. Gonzalez-Garcia will wait weeks for the chance to even begin the duplicative fingerprinting process, while her child remains in egregious conditions, resulting in continued harm to both Plaintiffs.

### C. THE BALANCE OF HARMS AND PUBLIC INTEREST WEIGH HEAVILY IN FAVOR OF EMERGENCY RELIEF.

The balance of harms and public interest weigh strongly in favor of granting emergency relief. Here, Ms. Gonzalez-Garcia seeks to unify her family, which is one of the strongest interests protected by law. *Lassiter v. Dept. of Soc. Services of Durham County, N.C.,* 452 U.S. 18, (1981)) (stating it is "'plain beyond the need for multiple citation' that a natural parent's 'desire for and right to the companionship, care, custody, and management of his or her children' is an interest far more precious than any property right.") (internal quotation marks omitted). *Santosky v. Kramer*, 455 U.S. 745, 753 (1982) (there is "a fundamental liberty interest of natural parents in the care, custody, and management of their child"); *Troxel v. Granville*, 530 U.S. 57, 65-66 (2000) (plurality op.) ("[T]he interest of parents in the care, custody, and control of their children [] is perhaps the oldest of the fundamental liberty interests recognized by this Court.") (collecting cases).

There is no discernible harm that will accrue to the government from allowing Plaintiffs to reunite, nor can the government have a cognizable interest in a policy which violates federal law. *Arizona Dream Act Coalition*, 757 F.3d at 1069 (quoting *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) ("'[I]t is clear that it would not be equitable or in the public's

---

[2] Policy Statement, Am. Acad. of Pediatrics, *Detention of Immigrant* Children, Mar. 2017, http://pediatrics.aappublications.org/content/early/2017/03/09/peds.2017-0483.

interest to allow the state ... to violate the requirements of federal law, especially when there are no adequate remedies available.'").

The only interest the government has articulated is in obtaining a duplicate set of fingerprints. When weighed against the harms visited by weeks of additional prolonged and isolating detention of a minor who is experiencing and emotional harm, the interests are not comparable.

### III.   CONCLUSION

Ms. Gonzales-Garcia and S.K. are likely to succeed on the merits of their claims that their constitutional rights are being violated by Defendants' actions in continuing to detain S.K. and refusing to unify the family. Accordingly, a Temporary Restraining Order and preliminary injunctive relief should be granted.

Respectfully Submitted,

PLAINTIFFS ANGELICA REBECA GONZALEZ-GARCIA and her daughter, S.K., by and through her mother, ANGELICA REBECA GONZALEZ-GARCIA,

By their Attorneys,

*/s/ Ronaldo Rauseo-Ricupero*
Ronaldo Rauseo-Ricupero (BBO# 670014)
Julia A.C. Lippman (BBO# 688852)
NIXON PEABODY LLP
100 Summer Street
Boston, MA  02110
(617) 345-1000
rrauseoricupero@nixonpeabody.com
jlippman@nixonpeabody.com

Susan B. Church (BBO# 639306)
Heather Yountz (BBO# 669770)

Demissie & Church
929 Massachusetts Ave., Suite 01
Cambridge, MA 02139
(617) 319-2399
sbc@demissiechurch.com

*Of Counsel*
Matthew R. Segal (BBO# 654489)
Adriana Lafaille (BBO# 680210)
American Civil Liberties Union Foundation of Massachusetts, Inc.
211 Congress Street
Boston, MA 02110
(617) 482-3170
alafaille@aclum.org

Dated: June 27, 2018

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on June 27, 2018, and are being transmitted by electronic mail to the Office of the United States Attorney for the District of Massachusetts.

/s/ *Ronaldo Rauseo-Ricupero*